Good morning, Your Honors. My name is Arthur Weed, and I'm the attorney for Darren Williams, who is the appellant here. Unless the Court has a different preference, I would begin with the first issue of the eight issues that were certified here. This is a very complex case, and there are an additional six uncertified issues. But the first issue, issue number one, is the Batson question. And the file reflects that at Williams' trial, which took place a little over 20 years ago in the Superior Court in Los Angeles, the prosecutor exercised six of his first eight peremptory challenges against blacks. Now, Williams himself is black, and so this presented a question, which at that time would be considered a Wheeler motion. And Williams' attorney made a motion for mistrial on the basis that there was purposeful discrimination. The judge then required the prosecutor to give racially neutral reasons, which, of course, is the second Batson step. And the prosecutor did this. And the judge said, okay, I'm satisfied with the reasons that you have given. The mistrial or the motion for mistrial is denied. Now, what we're seeing here Well, first of all, I should back up a little bit. That issue was raised in the California Supreme Court, and the Supreme Court rejected the Batson claim. But they did so on a strong likelihood basis. And as this Court knows, the U.S. Supreme Court has said that when a state rules on a Batson claim using a strong likelihood test, and then subsequently a federal petition for habeas corpus is filed, the review is de novo, because Batson itself doesn't provide that stringent of an analysis, if you see what I'm saying. Batson doesn't require that there be a strong likelihood of prejudice on the part of the prosecutor. Now, the strong likelihood test was applied in this case. And so what I've said in my opening brief is that this Court can review the Batson issue de novo. In other words, we're not bound here. How did the district court treat it? The district court simply said that there was a sufficient basis in the record for the State court's judgment to be upheld. It didn't really reach the issue. Well, it didn't – I mean, it wasn't – it didn't give any indication that it was particularly deferential to the State court finding. It looked at the evidence and determined that the evidence as presented to the State court was sufficient to justify a finding that there was no racial intent or discriminatory intent in the exercise of peremptories against people who were not death penalty qualified. Well, that's correct. But it did so without the benefit of an evidentiary hearing. And one of our uncertified issues is that we're requesting that if the Court is inclined to do so, that it would remand and order an evidentiary hearing. On what issue exactly? Well, particularly on this issue. I mean, specifically. I mean, we have the prosecutor saying this is why I struck James Tarrant, this is why I struck Harry Williams, this is why I struck Mary Shute and so forth. I mean, what would the hearing be? Well, I can't see that there would be any useful purpose in bringing the prosecutor in at this point. What would the hearing consist of? I think it would consist primarily of argument based upon matters that are already in the record. You can do that here, I guess. Okay. Well, I'm not sure how effectively I can do that here. Now, I indicate in my brief at page 17 going on over to 18 why it is that the prosecutor, and this is what we're complaining about, why it is that the prosecutor was in fact guilty of racial bias in this case. And that is he asked questions of the black panel members that he didn't ask of anyone else, the other members. In other words, what he did is he violated the recent Supreme Court holding in Miller L. versus Jackie, which I cited. Can you give me an example of that? I'm sorry? Can you give me an example of what he did? The questions? Well, yes. He would say, tell me a little bit about your family to a black jury person. And then when the time came to justify his parentry challenge, he would say, well, this person has a son that's serving time and so on. Now, what we can show in the record is that he didn't ask similar questions of white prospective jurors. He only did this with black jurors. Now, that's difficult to show, but I suggest that it is in the record, although my brief is, I admit, somewhat conclusory. I didn't notice any reference in the brief to specific places where, I mean, I saw the argument, but I didn't see any record references to where different questions were asked. No, there isn't. There isn't. I originally had that with my oversized brief, but then I had to cut it back, and so I took that out. Now, the reason I took that out is because it is before the Court in the application for certificate of appealability. There, it's laid out exactly what he did. There's a side-by-side comparison with black jury panel members and non-black. And so I thought, well, okay, if it's before the Court legitimately in the application for certificate of appealability, that would suffice. And I wasn't able to include it in my brief because of the page limitation. Now, going on to Argument 2, if that would be all right. Argument 2 says that when the jury, during their deliberations in this case, posited the question to the trial judge, what is meant by diminished capacity? You know, you'll recall from my brief that they asked that question. The judge committed error by saying, sorry, there is no longer such a thing under California law, which is true. You know, at that time, there wasn't, and there isn't today. What I'm suggesting that the judge should have said is he should have instructed the jury on voluntary intoxication as requested by Williams' trial counsel. He didn't do that. There was a hearing, and I quote at length from the transcript in my brief, where the judge said, well, we're sorry, but there just doesn't appear to be any evidence of intoxication in this case. Presumably, if there's no diminished capacity offense, but there is a voluntary intoxication defense, the voluntary intoxication has to be such that you couldn't even form a general intent. Is that the idea? Well, no. The lawyer, when he asked for this instruction, asked for it on the basis that it would go to the specific intent necessary for liability as an aider and abetter under the natural and probable consequences doctrine. And there is a case in California, People v. Mendoza, which I cite in my brief, that says, voluntary intoxication is a defense to liability predicated on aiding and abetting under the natural and probable consequences doctrine. Now, that case was decided after this case, but while it was still pending in the state courts. What I'm suggesting is that the judge gave a misleading instruction to the jury. And there is a case that I've cited in my brief, and I'm sorry, I don't remember the name of it, but I think we're all familiar with the general idea that if the trial court undertakes to give an instruction to clarify a question that the jury has, it actually has to clarify it. It can't mislead the jury. And see, what I'm suggesting happened here is that when the trial judge answered their question about diminished capacity by saying, well, there is no such thing, that that, in effect, misled the jury to believe that there was no such thing as a defense of voluntary intoxication under an aiding and abetting theory. And so what? But why would they be misled if there hadn't been an instruction in the first place on voluntary intoxication? It didn't, the subsequent instruction by the court did not suggest that they negate an instruction that had previously been given. It was simply a case of a court saying that a witness referring to your client as spaced out was inadequate to justify an instruction on involuntary intoxication. I'm not tracking on why the jury would be misled by being informed that there was no diminished capacity defense in the state of California. Well, what I'm saying here, and I realize that I have a problem in this court in complaining about a state instruction. In other words, I have to show that there was a federal constitutional violation. And what I've said is that there was, in the sense that the right to present a defense was abrogated in this case by the misleading instruction that the judge gave. It really doesn't go farther than that. There are cases that have said that if there's any evidence at all on a defendant's theory of his defense, he is entitled to an instruction. And the right to present a defense would be empty if it weren't backed up by the right to present an instruction. And so I'm saying it was reversible error for the court not to have instructed the jury. Now, going on, if the court please, to argument number three, which I feel is the strongest argument in this case, that argument is that the district attorney in this murder trial knowingly used perjured testimony. Now, the way that happened, here I think I have to get into what the background of the case was and what some of the facts were. This was a case where there were five people involved. There were two women, one of whom owned a van, and three other male individuals that took off in South Central Los Angeles, went to a house, and then one of them, not the defendant in this case, went in and shot four people. It was a very tragic event. The three men were all accused, and two of them were sentenced to death over this, including Mr. Williams. The person who drove the van was sentenced to life without parole. The two women were not prosecuted at all, even though it would appear that they would be equally liable with the three men. Now, one of the two women, a witness named Ida Moore, was the key witness in this case. In other words, if it were not for her testimony, there would have been no case against Darren Williams. Ida Moore put him at the scene and said, yes, he was the mastermind behind all of this. He decided to do this and do that, and so on. Now, during cross-examination of Ida Moore, sorry, a little distracting. During the cross-examination of Ida Moore, Williams's trial lawyer asked her if she had been paid anything for her testimony. You know, I read that colloquy several times, and it reads like an Abbott and Costello routine. If you ask her whether she's paid for her testimony, that doesn't mean she didn't get travel expenses. It doesn't mean she didn't get relocation. It means, you know, has anyone bribed you to testify? I mean, have you been paid for your testimony? I just don't see where you've proven that anything she said was demonstrably false, given the precise questions that were asked of her. Okay. The judge himself, you'll recall, took over the questioning and asked, were you paid anything from the victim witness fund? And she said no. Well, show me exactly where, what the exact question was. Some of the questions are in the present tense. Some are in the past tense. You know, they're asking her, did you, are you getting, have you been paid anything at present or lately? I forgot how it was put exactly, but I mean, I haven't seen where you've shown that anything she said was demonstrably untrue, given exactly what was asked of her. See, I think if you, okay, you have to divide the payments into two sections. There's this $2,000 payment that occurred a year and a half before the trial, and more or less right after when the police interviewed Ida Moore. In other words, they interviewed her, and then several weeks later, she was paid $2,000. The question was, are you receiving any money? I mean, that's now in the present tense. Are you receiving any money? She says, you know, I get it. I have a job. And you guys know from the district attorney's office, from any witness assistance program. No, I mean, she isn't, you haven't shown that she is getting any money other than her travel expenses, which she admits. Okay. Now, in the excerpts of record, the very first document, because it's the oldest document, is a request for payment signed by Detective Cruz, who was the chief investigating officer in this case. Detective Cruz submitted a request to the district attorney's office asking that Ida Moore be paid $2,000. Okay, but no one ever asked her, did you get $2,000? They didn't know that at the time. Well, then, where is her testimony false? She said she didn't get any money, and the very first part of the excerpts of records show that she did. Honestly, I don't see where the question was ever asked of her, have you ever gotten any money? Well, I think I'd be hard-pressed to find it exactly, but I think if you read the whole thing again and again, the judge and even the prosecutor on redirect examination asked her, were you paid anything? Were you paid anything for your testimony, was the question that was asked on redirect. Yeah. And she said no. No, and well, you haven't proved that she was paid for her testimony. Now, the judge himself, though, said, were you paid anything from the victim witness fund? No. Okay, that would be on page 42 of my opening brief, and it would be roughly in the middle of the page, Your Honor, where it's the court, from any witness assistance program. Yeah, the problem is that's a follow-up, are you receiving any money from either the district attorney's office or police from any witness? And I suppose she can say, well, I'm not receiving any money if she's all through receiving it. Well, it was a year and a half ago. She could say, well, a year and a half ago, we can forget that. I mean, I understand that she could well have said, well, no, I'm not now, but I was a question, are you receiving any money from the witness assistance program? And she could say, no, truthfully, because she wasn't receiving any money. Well, I guess, I think it's a question of how you look at it. Present tense, like you say, or past tense, because this is something that occurred a year and a half before the trial. Yeah, but the burden's on you to show that it's false. Well, I suggest that we've met that, that if you look at the document that's right at the start of the excerpt to record, I mean, that clearly establishes that she was paid $2,000. By the way, I see you're running out of time. Did you want to reserve any time for rebuttal? Yeah. Could I reserve two or three minutes? Yeah. We'll give you three minutes. Okay. Thank you, Your Honor. Mr. Glassman, good morning. Good morning, Your Honors. May I please the Court? David Glassman for the Respondent. I would like to, I think what I'll do, if it's convenient with the Court, is I'll just review the issues in the order they were addressed by Petitioner's counsel, starting with the Batson v. Kentucky claim. First of all, the argument was made in this Court today that the State court misapplied, given, of course, that the State court decision is, I think, about 15 years old at this point, misapplied Batson v. Kentucky in terms of how that United States Supreme Court has since been understood by appellate courts. There is no such flaw that any court in this case has ever recognized. The State Supreme Court doesn't give any indication of that. The District Court, at excerpts page 365, footnote 7 of the Magistrate Report and District Court Judge, states very simply, further, as the last sentence, since the California Supreme Court correctly, or rather, applied the correct Batson standard, the Court need not consider the effect of the trial court's misplaced inquiry on a systematic exclusion. So I think in a 20-year-old case, it is one of the late-in-the-day variations in this case to argue that this is somehow a misinterpretation of Batson v. Kentucky. Secondly, the suggestion was made that there ought to be an evidentiary hearing in this case, and as I think the Court pointed out, there was one. There was an elaborate evidentiary hearing in which the prosecutor offered reasons at length for every dismissal in question. And I noticed that in the briefs it's alleged that the prosecutor is Caucasian and that the – and that there was a systematic exclusion of African-American jurors and the defendant is African-American, and it's never acknowledged that the judge is African-American, and that the judge – I think, okay, one can only reasonably read this Batson inquiry as a judge that is extremely attentive to the issues in this case, including the Batson claim, and certainly conducts a thorough inquiry with respect to every challenge in question. And it is also true, although it is never mentioned by the Petitioner, that after explaining the challenges and the reasons for them, the prosecutor offers to stipulate to a jury entirely comprised of African-Americans in the veneer, and that nobody takes him up on that suggestion. So I do think that is an indication of his good faith. You wind up with some in the petty jury. There were African-Americans in the petty jury. I don't recall the number. Three. Three is my recollection, yeah. Three Asians. What about the claim that there was a differentiation in voir dire? Well, the problem with that claim, Your Honor, is that, as I indicated in the Appelese brief, even assuming that that's an exhausted claim, which it is not, that is, that there was, under the Miller-El case, some disparate questioning of African-American versus non-African-American jurors, the claim was never preserved. And furthermore, when the claim is raised in the opening brief in this Court, it is, as I think the Petitioner acknowledges, a conclusory claim. And you can suggest that it's because of page limits in a case in which the record is over 7,000 pages, but there was no restriction on anyone's ability to draw that type of distinction, and it simply wasn't done. And in that regard, I would note that there's no reply brief file. So my claim in that regard went unrebutted. Furthermore, the fact is that when it was suggested in the district court, the district court indicated that it had rebuked the entire voir dire, and that it's recognized no disparate questioning of any jurors. So I'm reluctant to volunteer to debate differences that no one has ever identified, other than to stand on the district court's interpretation that the questioning of all these jurors was consistent. Let's, if I could, I will move to the diminished capacity slash voluntary intoxication claim. Can I ask a question just, and it is a distraction from your argument a little bit, but there is a reference to the Petitioner presenting an alibi defense, and then it follows up with an explanation of the conversation with the police. Was the alibi defense presented at trial? It was. It was. And that is one of the reasons, Judge, that this is an academic exercise. The defense was not, I was there, I had some knowledge or involvement, but I was clouded either because I didn't know what they were about to do, which by the way is the Sarasot case that was recently cited to this court, a case from Seattle that has no relationship to this case. It was, I wasn't there. I wasn't a part of this contract murder, despite the admission of my statements that put me there in my own words. So the trial judge, who, and I'm really not trying to gild the lily. I do think that in a case of such length, his attention to the evidence and the issues presented was exceptional. When it is suggested, the same argument is made by trial counsel. Well, somebody has used the term spaced out, and now the jury has, you know, for whatever reason, posed some question on diminished capacity. How about an instruction on intoxication? Even though there is no evidence, obviously there's no defense of intoxication, because the defense is, I'm not present there. Not mentally present, not physically present. And when the suggestion is made that Brown, I think it was, described him as spaced out, that's it. One phrase within many statements that she made, he looked spaced out. The judge says, says, there is no evidence of intoxication at all. This is the trial judge. The word spaced out, whatever they mean, don't necessarily mean intoxicated. I know a whole lot of people referred to as space cadets, spaced out, based on personal lack of ability to focus their thoughts and actions. There is no evidence that anybody was under the influence of anything in this case. And that is Reporters' Transcript, page 3127, which is in the excerpts of page 547. Admit to the police in a taped interview that he was smoking marijuana that day. I don't recall that admission. He may have, I frankly just don't recall whether that's in the transcript or not. But as you know, the statements to police are a shifting and contradictory version of events where at certain times he is denying whether he's present, at other times he's admitting the ride in the van, the presence inside the home, and even the trip to collect the payment. So, I would like to then turn to the final argument that was raised today with respect to the claim of the knowing use of perjured testimony. And that, I think, can also be simply refuted in this case. First of all, there is no indication in this record that these women were, in the petitioner's view, equally liable. That is an overstatement by any stretch in terms of their role in the case, however you do it. And we are talking here about alleged false testimony of Ida Moore and Elisa Brown. First of all, it has to be noted that Moore, who is, it is alleged, is the one that perjured herself the most, I guess. Moore incriminates the petitioner before, allegedly, she receives any funds at all. So, it seems to me, from the starting point, that argument is moot. In other words, she has already presented her version to police before any payment is necessarily made to her. As far as whether she was paid and what she was paid, there are a couple things to note. It is, I think, correct, as you pointed out, Judge Silverman, that there is a little bit of a who's on first quality to that dialogue. Because she does not understand, initially, what it is that she's being asked. And I think it's clear that it is being suggested to her that she has been paid off or paid for her testimony, and that that is false, and that she wants to correct that misimpression. There was no clarification of what fees went to what purpose. But the fact of the matter is that if she was paid in $2,000, several things are true. She says, on the record, at trial, in front of the jury, that she is paid for airfare, she is paid for lodging, and she is paid for meals. And although I don't have that section of the excerpts in front of me, I believe that at one point she does indicate that she received witness assistance fees. Although I think her answers on that go both ways, in terms of what her understanding of the meaning of that terminology is. Second of all, as far as this scrap of information, which is really all we're talking about, that was submitted as part of a habeas corpus petition. It appeared to me as though that may reflect payment to her, not in this case, but in the case of the co-defendant, Tyquan Cox. And it's simply unclear whether those payments, whether those were in fact also reimbursement type payments or whatever, even occurred in this case in the first place. But the point is that there was an opportunity presented at trial 20 years ago, more than 20 years ago, to explore that issue. Defense counsel was obviously aware of it. That's why he was questioning her on the subject. And finally, even if in the, I think, completely hypothetical event that we were to somehow disregard that testimony, we still have, by other evidence in the case, the petitioner proceeding in the same course that she describes. On his way to the home, aware of the plan, witnessed by a neighbor of the victim outside the home immediately after the shots are fired, so it does not radically alter one's view of the case. The final point I would like to make, simply because a letter to that effect was addressed, so I'll be brief about it, as it was not addressed here in this oral argument. It has to do with the accomplice liability instructions. And the claim that somehow or other this crime, as the jury was instructed, this crime was an unforeseeable consequence of something that this petitioner never signed on for. And that explains the citation of the Sarasot case, a recent case from another panel in which the court found accomplice liability instructions in Washington inadequate in a Seattle State case in which the defendant, it was argued, went along for maybe an assault but not a murder. And to compound that sort of strict liability potential scenario, the prosecutor in that case, the trial prosecutor in State court, argued that his vicarious liability meant that if he was in for a dime, he was in for a dollar. Basically, that he was liable for any crime, however remote. That is fundamentally different than a case that was presented to a jury as a contract killing in which the participants knew exactly what they were going to do. That's it, unless the Court has any questions. Roberts. Thank you, Mr. Grassley. Thank you. Mr. Weed. Hang on a second. There we go. Two things only. I'll be very brief. As you said, Judge Silverman, the police officers, when interrogating Mr. Williams, did bring up the question of his intoxication. And Mr. Williams stated to them, and this was brought out at the trial, I was smoking pretty tough back then. Those were his exact words. And the smoking was not marijuana. It was cocaine. And the response to that by Detective Cruz was, I know. And so you should be aware of that. That in addition to the jury's question about diminished capacity, there was evidence of intoxication. The only other thing I would say, I would refer the Court to Morris, the recent case of Morris v. Yilts, which I cite in my brief, as far as the perjured testimony goes. In that case, and that's a fairly recent case, this Court said that when the district attorney suspects that there might be perjury, he has a duty to investigate. And much was made of this duty to investigate. Now, that was not done in this case. And what I'm suggesting is that it should have been done and that you could resolve that issue on a point of whether or not there was a duty to investigate in this case which was abrogated by the district attorney just sitting there and not doing anything. Is there a materiality requirement? As I looked at even taking the who's on first approach to the questioning, it came out that she was not being charged. It came out that she was receiving money. In light of all of that, is a prior payment, whether it's for living expenses out of State or otherwise, is that material to the outcome of this trial in any way, shape, or form? Yes, sir. I believe it definitely is for this reason, because if she lied about that, in other words, if you can show that there was something where she was asked under oath and she gave an untruthful answer to it, then what about the rest of her testimony? What about her putting the defendant right on the spot? What about all of that? In other words, just the fact that she lied about something is highly material, and this is so because she was the State's chief witness. Thank you, Your Honor. Thank you, Mr. Reed. Mr. Grassman, thank you. The case just argued is submitted. We'll stand and recess for the morning.
judges: Canby, Silverman , Leighton